**IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF NEW MEXICO**

ANTHONY MCMAHON,

       Plaintiff,

v.                                                                           Civ. No. 07-516 JP/WDS

KAREN GORDON MILLS, Administrator,
United States Small Business Administration,

       Defendant.

**<u>FINDINGS OF FACT AND CONCLUSIONS OF LAW</u>**

**Background**

On May 23, 2007, Plaintiff Anthony McMahon filed a Complaint for Damages from Age Discrimination and Retaliation in this Court. (Doc. No. 1.) McMahon alleged age discrimination by his former employer, the United States Small Business Administration ("SBA"), in violation of the Age Discrimination in Employment Act ("ADEA"). (*Id.* ¶¶ 36-44.) Specifically, he alleged the following discriminatory adverse actions: "forced reassignment, denial of accrued earned sick leave, the creation of a hostile work environment, disparate treatment with respect to the terms and conditions of McMahon's employment, and the termination of McMahon's federal job." (*Id.* ¶ 39.) He also alleged retaliation in violation of the ADEA through termination and denial of accrued sick leave. (*Id.* ¶¶ 45-53.)

On January 22, 2009, the Court held a pretrial conference. At the conference, McMahon waived any hostile work environment or disparate treatment claims. (Doc. No. 50.) However, McMahon maintained that denial of accrued sick leave was a separate adverse action against

him, while Defendant Karen Gordon Mills[1] argued that the denial was a natural consequence of the decision to remove McMahon from federal service. The Court agrees with Defendant Mills for that reason and two additional: 1) the proof of discriminatory or retaliatory denial of accrued sick leave would be identical to that for discriminatory or retaliatory discharge; and 2) any damages from the denial of accrued sick leave could be assessed as part of damages for wrongful discharge. Therefore, the Court does not treat the denial of accrued sick leave as a separate claim.

On November 10, 2008, Mills filed Defendant's Motion for Summary Judgment and Supporting Memorandum. (Doc. No. 39.) Mills moved for summary judgment "with respect to all counts of Plaintiff's Complaint." (*Id.* 1.) On January 22, 2009, the Court granted partial summary judgment in favor of Mills on McMahon's claim of discriminatory forced reassignment. (Doc. No. 51.) The Court did not dispose, though, of Mills's motion for summary judgment on McMahon's claims of discriminatory and retaliatory discharge. On March 9 and 10, the Court held a bench trial. At the trial, McMahon waived any constructive discharge claim. Therefore, McMahon's remaining claims are for discriminatory and retaliatory discharge. As a result of the bench trial, Mills's motion for summary judgment on those claims is moot, and the Court will proceed to "find the facts specially and state its conclusions of law separately" on the two remaining claims. Fed. R. Civ. P. 52(a)(1).

### Findings of Fact

Anthony McMahon was born in March, 1944. In 1972, he started working for the SBA as a loan specialist. After moving up the ranks, in 2000 he became the District Director for the

---

[1] On April 2, 2009, Mills was confirmed as Administrator of the Small Business Administration and therefore replaces the immediately previous named Defendant, Acting Administrator Darryl Hairston.

Albuquerque office of the SBA. In return for volunteering to move to Albuquerque from Chicago, McMahon was granted various incentives. As District Director in Albuquerque, he was the senior SBA representative for the state of New Mexico. Specifically, McMahon managed the SBA staff in the Albuquerque office, worked to carry out SBA programs, and protected SBA assets in New Mexico.

The events that are the subject of this case took place from 2005 to 2007. During that period, McMahon's direct supervisor was Joseph Montes, the SBA Regional Administrator for Region VI, a region composed of the states of New Mexico, Texas, Louisiana, Arkansas, and Oklahoma. There are six SBA offices in Texas–including one in Lubbock–and one office in each of the other states in Region VI. Each office has its own District Director. During the years 2005 to 2007, Montes' supervisor was Michael Pappas, Associate Administrator for Field Operations, a position based in Washington, D.C. Both Montes and Pappas relied on Paul Gutierrez, Center Director for the SBA Office of Human Capital Management, for advice on personnel matters.

In July, 2005, Tom Dowell, the District Director for the Lubbock office, left for an SBA position in Kentucky. As Regional Administrator, Montes was responsible for filling the Lubbock District Director position. He had two options for doing so: a competitive (voluntary) process or a directed (involuntary) reassignment. Montes did not consider the competitive process; instead, he reviewed one former and several current District Directors in Region VI for directed reassignment and concluded that McMahon was the only available and qualified candidate. In Montes' opinion, McMahon did good work: he was professional, very well qualified, and by far the best candidate to "turn [the Lubbock] office around." Montes, however, did not discuss the possible reassignment with McMahon or explain to McMahon the need for a District Director in the Lubbock office. Instead, Montes started the formal process of

reassignment on December 13, 2006, by sending the necessary forms to Pappas. Montes

explained to Pappas that he was proposing McMahon for the position because the Lubbock

District was not able to meet its goals. In fact, it was near the bottom in the SBA's ranking of all

offices. In Montes' judgment, sending McMahon there would "improve[] management" and

"increase[] productivity." Pappas viewed McMahon as a "respected and knowledgeable" District

Director and approved the reassignment.

        McMahon first learned that he might be reassigned to Lubbock in a conversation with

Montes on February 13, 2006. One half hour later, McMahon received official notice–through a

letter from Montes–of the reassignment. The delay of two months after Montes' December 13,

2006 decision to reassign McMahon was unusual; Montes attributes the delay to his

preoccupation with SBA issues resulting from Hurricanes Katrina and Rita. The letter was

written by Gutierrez (or his office) but approved and signed by Montes. It stated that McMahon

was to report to the Lubbock office on March 20, 2006. The letter explained that the "action

[was] being taken because it has been determined that [McMahon's] services could best be

utilized in the Lubbock District Office." McMahon had fifteen calendar days to decide to accept

or reject the reassignment; however, if he rejected it, Montes would propose his removal from

federal service.

        McMahon reacted to the reassignment with shock, dismay, and disbelief. He had never

seen a reassignment done in this way. Previously, if he had been asked to go to a troubled office,

the request was discussed with him before reassignment took place and he was given an

opportunity to negotiate pay incentives or other support for the move. The next day, February 14,

2006, McMahon took two weeks of vacation. On February 26, 2006 he accepted the

reassignment, but asked Montes to postpone the effective date from March 20 to April 2 so that

McMahon could have time to move to Lubbock; Montes granted the postponement. Despite McMahon's concerns about the Lubbock office, he did not try to discuss them with Montes before accepting the reassignment, nor did Montes talk with McMahon during the same period.

As a result of the reassignment and the manner in which it was carried out, McMahon experienced severe reactions, including insomnia, fatigue, heart palpitations, dizziness, inability to concentrate, and short term memory loss. He first went to his primary care physician, who prescribed 5 milligrams of an antidepressant and recommended that McMahon see a psychiatrist. McMahon took his doctor's advice and saw a psychiatrist, Dr. Steven Sacks, for the first time on March 8, 2006. Based on the symptoms described by McMahon, Dr. Sacks diagnosed him as suffering from major depression, single episode, of very severe intensity. Dr. Sacks increased the dosage of the antidepressant to 10 mg and scheduled weekly sessions with McMahon. Dr. Sacks also advised McMahon to cancel his plans to go to Lubbock and to take sick leave.

On March 13, 2006, McMahon requested sick leave from Montes. At that date, McMahon had accumulated 2513 hours–well over a year–of sick leave. With his request, McMahon included a letter from Dr. Sacks, which stated that McMahon was "currently unable to perform his usual duties" of his job and would "probably be unable to return to work until he has responded to treatment." Dr. Sacks indicated he would "continue to monitor [McMahon's] response." On the same day, after meeting with McMahon, Dr. Sacks increased the dosage of the antidepressant to 15 mg.

After he received McMahon's request for sick leave, Montes sent it on to Gutierrez for advice on how to respond, assistance Gutierrez often gave for non-routine sick leave requests. Gutierrez viewed McMahon's request as one for indefinite sick leave, a type of request Gutierrez had experience handling. Requests for indefinite sick leave typically happened when a doctor

could not determine a return-to-work date, and these requests were handled on a case-by-case basis. Gutierrez (or someone in Gutierrez' office) drafted a letter which Montes reviewed and signed. In the letter, dated March 20, 2006, Montes approved McMahon's request for sick leave and did not limit his approval to a specific period of time. However, Montes stated that, as Dr. Sacks had not indicated "an expected date of recovery," Montes intended to follow up with McMahon at the end of March "to ascertain [McMahon's] progress" so that Montes could "make further determinations as to [McMahon's] anticipated physical relocation to the Lubbock District Office."

On March 29, 2006 McMahon responded in writing to Montes' letter. McMahon told Montes that "[t]he follow up as it relates to treatment progress needs to be directed to my [p]hysician." McMahon stated that his "need for an indefinite sick leave of absence" was triggered by the reassignment to Lubbock. One week earlier, on March 21, McMahon had met with Dr. Sacks for the second time. McMahon commented to Dr. Sacks that he was doing better physically and had more energy. Dr. Sacks asked McMahon about the amount of sick leave McMahon had; McMahon told Dr. Sacks he had more than one year. McMahon also told Dr. Sacks that he was considering volunteering to work on an SBA project while on leave. Dr. Sacks met with McMahon again on April 4. They discussed possible options for McMahon, including reporting to Lubbock, using up his remaining sick leave, working as a volunteer, and retiring and retaining an attorney.

Despite Montes' expressed intent to follow up with McMahon at the end of March, he did not do that and throughout April there was no communication between the two, nor did anyone else at SBA communicate with McMahon. Gutierrez did not know why Montes failed to follow up; Montes again attributed it to the substantial amount of time he had to spend dealing

with the aftermath of Hurricanes Katrina and Rita. At some point, Gutierrez (or his office) drafted a follow up letter, which was approved and signed by Montes. In the letter, dated May 5, 2006, Montes acknowledged receipt of McMahon's March 29 letter. Montes then stated there was no authority for him to grant "indefinite sick leave." Because the information in Dr. Sacks' March 13 letter "ha[d] become dated," Montes requested updated and more detailed medical documentation, including 1) Dr. Sacks' "assessment of the current clinical status and plans for future treatment"; 2) Dr. Sacks' "explanation of the impact of the medical condition on life activities both on and off the job," specifically including a certification from Dr. Sacks that McMahon was "incapacitated to perform [his] duties"; and 3) a prognosis from Dr. Sacks, "including the expected date of full or partial recovery that [would] allow [McMahon's] return to work." The SBA policy for granting sick leave allows supervisors to request a medical certificate for absences in excess of three days, and to request periodic certification for prolonged absences. Montes stated, "This information is necessary in order for me to continue to approve sick leave for you and so that I may accordingly plan for the day-to-day management of the Lubbock District Office." Montes did not indicate, though, that McMahon might lose his job if he failed to comply. Montes also noted that he could not get the information directly from Dr. Sacks; instead, McMahon would have to provide it. Finally, Montes approved sick leave for McMahon through May 15, 2006, and, somewhat inconsistently, required the medical documentation by May 17.

    McMahon responded by email on May 10, 2006, the day after he received Montes' May 5 letter. McMahon pointed out that he had been given a very short amount of time to get the necessary information from Dr. Sacks. He also pointed out that if he had been given earlier notice or a response to his March 29 letter telling him that Montes could not contact Dr. Sacks

directly, McMahon would have been able to get the information to Montes by the deadline. As a result, McMahon requested additional time to respond. He also questioned the need for information about the impact of his condition on his personal life. Montes responded by letter on May 12, 2006, granting an extension of the deadline to May 24, 2006. On May 15, McMahon sent Montes a leave slip for May 16 through May 22 and indicated to Montes that he would be able to see Dr. Sacks on May 17 and get the needed documentation.

On May 17, 2006, McMahon sent Montes a letter with a report also dated May 17, 2006 by Dr. Sacks attached. In his report, Dr. Sacks stated that McMahon had improved but "ha[d] not yet attained his pre-morbid ability to deal with the stresses he had dealt with at work." Dr. Sacks noted that he was meeting with McMahon "to deal with his remaining symptoms of depression" and would "continue to monitor his progress." However, Dr. Sacks "d[id] not expect that he would be able to return to work, even on a part-time basis for another ninety days." Although he did not state it in his report because it was hard for him to exactly predict, at the time of the report Dr. Sacks expected that ninety days would be enough to successfully treat McMahon and allow him to return to work. In addition, Dr. Sacks reported that McMahon had "not authorized [him] to reveal information concerning [McMahon's] life activities other than those immediately related to his employment responsibilities."

McMahon attached leave slips for ninety days–the period recommended by Dr. Sacks–to the May 17 letter. McMahon then stated that Montes' May 5 letter had caused him "stress and angst" and that he hoped the ninety days of leave would make "communications such as" the May 5 letter unnecessary. He also stated, "It is my opinion that a discriminatory practice is being applied in my case." McMahon based his opinion on "the probative and detailed nature" of the requested medical information. In his view, this "reflect[ed] a bias where mental health is at

issue." McMahon's May 17 letter made no reference to a bias or discrimination based on his age. After he sent the letter, McMahon assumed he would be given ninety days of sick leave.

Two days earlier, on May 15, 2006, McMahon had made initial contact with the Equal Employment Opportunity ("EEO") office of the SBA. At that date, McMahon thought he was being treated in a discriminatory fashion on account of his disability and not his age.[2] On June 5, 2006 an EEO counselor, Gaye Walker, conducted an initial interview with McMahon as part of the EEO office's "informal complaint" procedure. In this interview, McMahon complained of discrimination on the basis of age as well as disability.[3] McMahon believed that the SBA had a pattern of reassigning older employees to less desirable locations, a belief that also played a part in McMahon's reaction to his own reassignment. McMahon did not tell Montes, Pappas, or Gutierrez about his contacts with the EEO office on May 15 and June 5, 2006 near the dates they happened.

In mid-May, Montes discussed options with Gutierrez again. Gutierrez reviewed Dr. Sacks' second letter and noted that McMahon was currently unable to return to work. In addition, Gutierrez was not able to get a sense from Dr. Sack's letter of when McMahon might return. Gutierrez told Montes that he could propose McMahon's removal for physical inability to do the District Director job, if, after weighing factors such as the needs of the Lubbock office, Montes determined it was in the best interests of the SBA. Instead of talking to McMahon to try to work things out–an option not suggested by Gutierrez–Montes decided to go ahead and remove McMahon. Montes never approved McMahon's request for ninety days of leave;

---

[2] McMahon testified that disability was his ground for alleging a "discriminatory practice" when he sent his May 17 letter, and that letter references only disability. The Court infers that disability was his sole ground for his initial EEO contact on May 15.

[3] The Court infers this from Dr. Sacks' testimony and notes regarding his meeting with McMahon on June 7, two days later.

however, McMahon remained on sick leave until July 17, 2006, when he retired.

Gutierrez drafted the notice of proposed removal. As the situation is relatively rare, there is no written policy at the SBA governing removal of an employee for physical inability to perform the duties of the employee's position. In contrast, procedures for removal (and other adverse actions) for disciplinary reasons are specified in Chapter Five of the SBA manual, Discipline and Adverse Actions. However, there is an unwritten procedure–which Gutierrez followed–that is guided by the requirements of due process and the procedures for disciplinary adverse actions. The draft notice was laid out in the same fashion as a notice of a disciplinary action, with a charge, a specification of the facts supporting the charge, an account of the agency considerations supporting the action, and an explanation of the employee's rights. The notice proposed to remove McMahon "for non-disciplinary reasons"; however, this did not imply that the action was a "non-disciplinary action," which would fall under Chapter 2 of the SBA manual. McMahon was charged with physical inability to perform the duties of his position. In support of the charge, the notice stated that Dr. Sacks had not been able "to provide a positive prognosis as to [McMahon's] expected date of recovery and return to duty." The notice concluded, "Therefore, currently, you are physically unable to perform the duties of your position and there is no foreseeable date on which you can return to duty." As considerations supporting the removal action, the notice cited the adverse effect of McMahon's absence on the Lubbock office and the difficulty for the SBA in covering for his absence due to "personnel and resource reductions that [were] expected to continue." Finally, the notice explained that Pappas was the "deciding official in th[e] action" and that McMahon had fifteen calendar days to respond to the notice . Montes approved the draft notice and sent it to McMahon in the form of a letter dated June 14, 2006, ending Montes' role in removing McMahon.

On June 28, 2006 McMahon responded by letter to Pappas. He first attempted to rebut the charge that there was no foreseeable date by which he could return to work by pointing out that Dr. Sacks "had actually said that it would be reasonable to reassess my condition and status in ninety days." He then disputed the considerations stated in the notice by noting that the Lubbock office had not deteriorated in its performance since the District Director position became vacant, that alternative administrative actions could be taken that would not require McMahon's removal, and that the notice stated that "extensive alternative arrangements" for the Lubbock office had already been made. Finally, McMahon accused the SBA of discriminating on the basis of "my illness and my age," because the SBA had "not published a policy of denying sick leave due to personnel shortages." He then stated he had "filed an EEO complaint against the [SBA] on May 29th"–a mistaken date which referred to his May 15th contact–and "view[ed] this action as retaliatory."

Pappas had not been involved in any of Montes' decisions regarding McMahon's sick leave, although he had been informed by Montes that McMahon was requesting extended sick leave. However, after Montes proposed to remove McMahon, Pappas became the deciding official. Pappas reviewed Montes' proposal, McMahon's response, and Dr. Sacks' May 17th letter. Pappas also spoke with Montes and asked Gutierrez to review McMahon's response. Gutierrez concluded that McMahon had failed to rebut the charge. Gutierrez told Pappas it would be unreasonable for the SBA to wait for an indeterminate amount of time for McMahon to return to service. In their discussions, Pappas and Gutierrez did not discuss McMahon's age or his EEO complaint. Pappas decided to approve the proposal and remove McMahon. Gutierrez drafted the letter of removal and Pappas sent it on July 11, 2006.

In the notice of removal, Pappas stated that he had considered all the evidence and found

that removal was necessary. The issues raised by McMahon in his response "form[ed] no basis for [Pappas] to reject the proposal." McMahon's "absence from Lubbock ha[d] placed a considerable burden on SBA staff members" by increasing their workload. Because McMahon had "presented no evidence that indicate[d] a foreseeable date" on which McMahon could return to work, "it [was] unreasonable for [the SBA] to continue" to employ McMahon and "to approve an unspecified amount of sick leave." Pappas stated that he took into account McMahon's "length of service" and his "at least fully successful" performance but there were "no other options to consider." Finally, Pappas noted that it was not McMahon's choice to be absent; therefore, the removal was for "non-disciplinary reasons."

The removal was to become effective on July 17, 2006. Concerned about his benefits, McMahon decided to retire on that day, and the removal was never carried out. At that point, McMahon had 1830 hours of sick leave remaining, which was credited towards his years of service in determining his annuity. On the same day, Walker sent McMahon notice of his right to file a formal complaint. Walker had been unable to resolve McMahon's claims through the informal process. On July 21, 2006 McMahon filed a formal complaint with the EEO office of the SBA, alleging discrimination on the basis of age and disability as well as retaliation.

McMahon had continued to see Dr. Sacks in June and July, 2006. Dr. Sacks reduced the dosage of the anti-depressant to 10 and then 5 milligrams. On August 2, Dr. Sacks recommended that McMahon stop taking the anti-depressant. Although they agreed that McMahon had improved to the point that he could return to work, there was no need for Dr. Sacks to provide a written release because McMahon had retired.

After McMahon's retirement, Montes had to find a new District Director for the Lubbock office. This time, he decided to use the competitive process. On January 10, 2007, Pappas

approved the selection of Herb Johnston, a Deputy District Director in the Atlanta, Georgia

office, for promotion to District Director of the Lubbock office. Johnston was born in October,

1943, and is therefore five to six months older than McMahon. He was selected for the position

due to his knowledge of SBA's lending programs, an area in which the Lubbock office's

performance was particularly poor.

### Conclusions of Law

#### *McMahon's Claim of Discriminatory Discharge*

The ADEA requires federal agencies to make "personnel actions affecting employees ...

who are at least 40 years of age ... free from any discrimination based on age." 29 U.S.C. §

633a(a) (2006). The removal of Anthony McMahon was such a personnel action, as McMahon

was employed by a federal agency, the United States Small Business Administration, and was 62

years of age at the time. Therefore, McMahon was protected by § 633a.

When an employee with an age discrimination claim relies on circumstantial evidence

and the employer moves for summary judgment, the motion is analyzed under the *McDonnell

Douglas* burden-shifting framework. *Adamson v. Multi Cmty. Diversified Servs., Inc.*, 514 F.3d

1136, 1145 (10th Cir. 2008); *Hodgson v. U.S. Air Force*, 999 F.2d 547, 1993 WL 261873, at *3

(10th Cir. 1993) (unpublished table opinion) (*McDonnell Douglas* applies to § 633a claims).

> This three-step analysis first requires the plaintiff to prove a prima facie case of
> discrimination. If plaintiff establishes a prima facie case, the burden of going forward
> shifts to the defendant to produce a legitimate, nondiscriminatory reason for its actions. If
> the defendant does so, the plaintiff must either show that his [] age ... was a determinative
> factor in the defendant's employment decision, or show that the defendant's explanation
> for its action was merely pretext.

*Adamson*, 514 F.3d at 1145. (citations and quotations omitted).

After trial, though, the *McDonnell Douglas* framework "is largely irrelevant." *Stewart v.

Adolph Coors Co.*, 217 F.3d 1285, 1288 (10th Cir. 2000) (race discrimination claim under Title

VII and § 1981); *Sanchez v. Philip Morris Inc.*, 992 F.2d 244, 246 (10th Cir. 1993) (bench

trials).[4] Instead, the issue is whether the plaintiff has met his ultimate burden: showing by a

preponderance of the evidence that the defendant intentionally discriminated against him. *Reeves*

*v. Sanderson Plumbing Products, Inc.*, 530 U.S. 133, 143 (2000) (ADEA). However, the

*McDonnell Douglas* framework remains relevant after trial in certain ways. First, if the trier of

fact determines that the plaintiff has established a prima facie case and disbelieves the

employer's stated legitimate, non-discriminatory reason for the action, it is permissible, though

not mandatory, for the trier of fact to find that the plaintiff has met the ultimate burden. *Id.* at

146-47. Second, if the plaintiff makes his prima facie case–not as a matter of law but as a matter

of fact at trial–and the defendant does not offer a legitimate, non-discriminatory reason for the

action, then the plaintiff is entitled to judgment. *St. Mary's Honor Ctr. v. Hicks*, 509 U.S. 502,

509-10 (1993). It is only after the defendant, in response to the plaintiff's prima facie case, has

"offered admissible evidence sufficient for the trier of fact to conclude" that the defendant's

stated reason was the actual reason for the action, that *McDonnell Douglas* drops out. *Reeves*,

530 U.S. at 142-43. Even then, though, "the trier of fact may still consider the evidence

establishing the plaintiff's prima facie case and inferences properly drawn therefrom on the issue

of whether the defendant's explanation is pretextual," *Id.* at 143 (citation and quotation omitted);

---

[4] In *Messina v. Kroblin Transp. Systems, Inc.*, 903 F.2d 1306 (10th Cir. 1990), the Tenth Circuit expressed its disapproval of the use of *McDonnell Douglas* in jury instructions, reasoning that the framework is "of little relevance to a jury" because it is based in "technical legal distinctions likely to be understood only by attorneys and judges." *Id.* at 1308. "*McDonnell Douglas* guidelines play differently to a jury *than they do in a bench trial*." *Id.* (emphasis added). In another case tried before a jury, *Fallis v. Kerr-McGee Corp.*, 944 F.2d 743 (10th Cir. 1991), the Tenth Circuit simply stated, "[A]fter a full trial on the merits," the *McDonnell Douglas* framework "drops out." *Id.* at 744 (citing *Messina*, 903 F.2d at 1308). Finally, in *Sanchez*, a case tried before the bench, the Tenth Circuit cited *Fallis* for its blanket statement about trials. Thus the original reasoning of *Messina* was lost. In any case, *Reeves* and *Hicks*–both decided after *Sanchez*–govern the relevance of *McDonnell Douglas* after trial.

*see also id.* at 148-49 (factors that may be considered in a motion for a judgment as a matter of law include "the strength of the plaintiff's prima facie case [and] the probative value of the proof that the employer's explanation is false."). Furthermore, proof that the defendant's reason is pretext is "part of (and often considerably assists) the greater enterprise of proving that the real reason was intentional discrimination." *Hicks*, 509 U.S. at 517.

Here, the SBA has offered sufficient admissible evidence that a trier of fact could reasonably conclude that McMahon's physical inability to perform the duties of his position as District Director of the Lubbock office  was its actual reason for removing him. McMahon has not disputed, and the Court concludes, that this is a legitimate, non-discriminatory reason. *See Norville v. Staten Island University Hosp.*, 196 F.3d 89, 97 (2d Cir. 1999) (physical inability a legitimate, nondiscriminatory reason). Thus, *McDonnell Douglas* drops out as governing law, and the Court's task is simply to decide if McMahon has met his ultimate burden: showing by a preponderance of the evidence that he was removed because of his age. However, the Court may still consider the evidence establishing McMahon's prima facie case in making this determination, as well as the evidence bearing on the SBA's stated reason for removing him. Thus, the Court will review the law governing McMahon's prima facie case and rebuttal of the SBA's reason as pretext, not because that law governs after trial, but in order to assess the strength of the evidence for the ultimate issue.

A prima facie case of discriminatory discharge under the ADEA "ordinarily requires the plaintiff to show that he or she was: (1) within the protected class of individuals 40 or older; (2) performing satisfactory work; (3) terminated from employment; and (4) replaced by a younger person, although not necessarily one less than 40 years of age." *Adamson* , 514 F.3d at 1146. "[R]eplacement by an older or insignificantly younger worker does not per se doom a prima

facie case if both are within the protected age group." *Id.* However, if a plaintiff cannot make the standard prima facie case, he must present other evidence that is "adequate to create an inference that the adverse employment decision was, in fact, motivated by plaintiff's age." *Id.*

Here, McMahon failed to make the "ordinary" prima facie case. His replacement, Johnston, is five to six months older than McMahon. Citing *Munoz v. St. Mary-Corwin Hosp.*, 221 F.3d 1160 (10th Cir. 2000), McMahon argues that this difference is not significant. However, *Munoz* cuts against McMahon, not for him. In *Munoz*, the Tenth Circuit held that a plaintiff failed to make his prima facie case when he showed that he was replaced by a person who was two years *younger*. "[B]ecause plaintiff's replacement was only two years his junior–an obviously insignificant difference–the necessary inference of discrimination was precluded, and he failed to establish his prima facie case." *Id.* If a plaintiff fails to make his prima facie case when he shows he was replaced by someone two years younger, he also fails when he shows he was replaced by someone five to six months older.

McMahon next points to other discriminatory discharge cases in which the Tenth Circuit has formulated the fourth element of a plaintiff's prima facie case less exactingly. *Perry v. Woodward*, 199 F.3d 1126 (10th Cir. 1999); *Kendrick v. Penske Transp. Services, Inc.*, 220 F.3d 1220 (10th Cir. 2000). *Perry* and *Kendrick* were racial discrimination cases that arose under 42 U.S.C. § 1981. *Perry*, 199 F.3d at 1134; *Kendrick*, 220 F.3d at 1225. In both cases, the Tenth Circuit rejected as the fourth element of a plaintiff's prima facie race-discriminatory discharge case a showing that he was replaced by someone outside his protected racial group. Instead, the plaintiff only needed to show that "the job was not eliminated after his discharge." *Perry*, 199 F.3d at 1135; *Kendrick*, 220 F.3d at 1229. The *Perry* court stated that language in earlier opinions suggesting otherwise "originated in age discrimination cases in which this court

articulated a prima facie case that included a requirement of replacement by someone outside the protected class," an approach specifically rejected by the Supreme Court in *O'Connor v. Consolidated Coin Caterers Corp.*, 517 U.S. 308 (1996). *Perry*, 199 F.3d at 1137. After noting that the Supreme Court in *O'Connor* had required "a logical connection between each element of the prima facie case and the inference of discrimination," *id.* at 1136, the *Perry* court then explained how its definition of a prima facie case made that connection:

> When viewed against the backdrop of historical workplace discrimination, an employee who belongs to a racial minority and who eliminates the two most common, legitimate reasons for termination, i.e., lack of qualification or the elimination of the job, has at least raised an inference that the termination was based on a consideration of impermissible factors. The firing of a qualified minority employee raises the inference of discrimination because it is facially illogical to randomly fire an otherwise qualified employee and thereby incur the considerable expense and loss of productivity associated with hiring and training a replacement.

*Id.* at 1140; *see also Kendrick*, 220 F.3d at 1226-29 (summarizing the reasoning of *Perry*). McMahon argues for an extension of *Kendrick* and *Perry* to ADEA cases, an extension that would require him to show only that his job was not eliminated to raise the inference that he was discriminated against on account of his age.

One day before the Tenth Circuit issued its opinion in *Kendrick*, reiterating and summarizing its reasoning in *Perry*, it issued its opinion in *Munoz*, an ADEA case. As noted by McMahon, in *Munoz* the Tenth Circuit specifically quoted the *Perry* court's articulation of a general prima facie case for discriminatory discharge. *Munoz*, 221 F.3d at 1165. However, the *Munoz* court then went on to state that a prima facie case under the ADEA must contain sufficient evidence to raise an inference of age discrimination. *Id.* (citing *O'Connor*, 517 U.S. at 312). Relying on dicta in *O'Connor*, the Tenth Circuit held that a plaintiff who had showed he was replaced by a person two years younger had failed to raise an inference of age discrimination. *Id.* (citing *O'Connor*, 517 U.S. at 313). Despite the citation by the *Munoz* court

of *Perry*, the result in *Munoz* is inconsistent with applying in an ADEA case the articulation of a race discrimination prima facie case presented in *Kendrick* and *Perry*.[5] The Tenth Circuit has not imported the *Kendrick/Perry* standard into ADEA cases, a conclusion that is supported by subsequent opinions of the Tenth Circuit reciting the prima facie requirement for age-discriminatory discharge. *Miller v. Eby Realty Group LLC*, 396 F.3d 1105, 1111 (10th Cir. 2005); *Adamson*, 514 F.3d at 1146. Therefore, the Court rejects McMahon's argument for extending the *Perry*/*Kendrick* race discrimination standard into ADEA cases.

Finally, McMahon argues that a plaintiff's prima facie case is "a flexible one that can be satisfied differently in different scenarios." *Plotke*, 405 F.3d at 1099. As noted by the Tenth Circuit in *Adamson*, "replacement by an older or insignificantly younger worker does not per se doom a prima facie case if both are within the protected age group." *Adamson*, 514 F.3d at 1146. However, "the evidence must nevertheless be adequate to create an inference that the adverse employment decision *was,* in fact, motivated by plaintiff's age." *Id*; *accord Munoz*, 221 F.3d at 1165. As discussed above, merely meeting the weaker *Kendrick*/*Perry* standard is insufficient. If McMahon cannot make the standard ADEA prima facie case, he must present "other direct or circumstantial evidence establishing the requisite inference." *Adamson*, 514 F.3d at 1146.

Here, McMahon has failed to present any other admissible evidence that could allow an inference that his removal was motivated by his age. Defendant, on the other hand, has presented evidence that two of the three decision makers–Montes and Gutierrez–were not motivated by age and that Gutierrez and Pappas did not discuss McMahon's age. Therefore, the Court concludes that McMahon has not made a prima facie case of age-discriminatory discharge. Furthermore,

---

[5] Despite the inconsistent results, the Court does not infer an inconsistency in the Tenth Circuit's reasoning; in fact, one Circuit Judge served on both the *Kendrick* and *Munoz* panels. Instead, the Court infers that the Tenth Circuit sees age discrimination cases in a light different from race discrimination cases.

the analysis could stop here, because McMahon's failure to make a prima facie case by presenting "other direct or circumstantial evidence" of age discrimination implies a failure to meet his ultimate burden of showing that his removal was motivated by his age.

However, McMahon argues that a strong showing of pretext can suffice to make his case. While the Court disagrees with this proposition in the absence of any evidence of age discrimination, the Court will examine the strength of the pretext evidence. "Pretext can be shown by such weaknesses, implausibilities, inconsistencies, incoherencies, or contradictions in the employer's proffered legitimate reasons for its action that a reasonable factfinder could rationally find them unworthy of credence and hence infer that the employer did not act for the asserted non-discriminatory reasons." *Riggs v. AirTran Airways, Inc.*, 497 F.3d 1108, 1118 (10th Cir. 2007) (citation and quotation omitted). The Court does not examine "whether the employer's reasons were wise, fair or correct" and does not "second-guess the employer's decision even if it seems in hindsight that the action taken constituted poor business judgment." *Id.* The Court's "role is to prevent intentional discriminatory hiring practices, not to act as a 'super personnel department.'" *Id.* (citation and quotation omitted).

The evidence shows that Defendant was only guilty–if at all–of poor business judgment. McMahon was a valuable and experienced District Director. Defendant's decision to remove him, without any attempt to negotiate or communicate, deprived the SBA of his experience for little gain. It took several months to replace McMahon, who became healthy and able to work just two weeks after he retired. However, there is no evidence of inconsistencies or contradictions in the SBA's reason–other than the determination that McMahon's removal was in the best interests of the SBA, a business judgment that the Court cannot second guess.

In summary, the Court first concludes that McMahon was protected under the ADEA.

After reviewing the testimony and the exhibits, the Court concludes that there is no evidence establishing a prima facie case of age discrimination or showing the Defendant's reason for terminating McMahon's employment to be pretext. In addition, Montes and Gutierrez testified credibly that age did not play a part in the decision to remove McMahon. The Court concludes that McMahon's removal was not "because of" his age and that the SBA is therefore not liable on his claim of discriminatory discharge under the ADEA.

*McMahon's Claim of Retaliatory Discharge*

§ 633a also protects employees of federal agencies against retaliation by the employing agency for opposing age discrimination or for participating in an ADEA proceeding. *See Villescas v. Abraham*, 311 F.3d 1253, 1258 (10th Cir. 2002) (noting that the Tenth Circuit has assumed and the EEOC has recognized the existence of a cause of action for retaliation under § 633a); 29 C.F.R. § 1614.101(b) (both opposition and participation are protected).When the employee relies on circumstantial evidence of retaliation and the employer moves for summary judgment on a retaliation claim, the burden-shifting framework of *McDonnell Douglas* is used to analyze the motion. *Hinds v. Sprint/United Mgmt. Co.*, 523 F.3d 1187, 1202 (10th Cir. 2008).

However, at trial, *McDonnell Douglas* is again "largely irrelevant." *Cf. Hysten v. Burlington Northern Santa Fe Ry. Co.*, 530 F.3d 1260 (10th Cir. 2008) (retaliation claim under Federal Employer's Liability Act). Instead, plaintiff must show that the adverse action was motivated, at least in part, by his protected activity. *Cf. id.* As with McMahon's claim of age discrimination, the trier of fact can consider the evidence relevant to *McDonnell Douglas*, and it is permissible, but not mandatory, for the trier of fact to find liability when the plaintiff has made his prima facie case and shown the employer's reason to be pretext. *Cf. Reeves*, 530 U.S. at 143-47.

Because reviewing the strength of McMahon's prima facie case of retaliation is relevant to the Court's ultimate determination, the Court recounts the law governing it. To establish a prima facie case of retaliation in violation of the ADEA, a plaintiff must show "(1) he or she engaged in protected opposition to discrimination, (2) a reasonable employee would have considered the challenged employment action materially adverse, and (3) a causal connection existed between the protected activity and the materially adverse action." *Hinds*, 523 F.3d at 1202. Although a causal connection may be inferred from close temporal proximity between a protected activity and adverse action, *Anderson v. Coors Brewing Co.*, 181 F.3d 1171, 1179 (10th Cir. 1999) (citation omitted), the plaintiff must also show that "the individual who took adverse action against [him] knew of [his] protected activity." *Montes v. Vail Clinic, Inc.*, 497 F.3d 1160, 1176 (10th Cir. 2007).

McMahon's May 17, 2006 letter did not constitute opposition to age discrimination–it referred only to discrimination on the basis of disability. Similarly, McMahon's May 15, 2006 initial contact with the EEO office did not constitute participation in a proceeding protected by the ADEA, as McMahon did not mention age discrimination at that time. On the other hand, McMahon's June 5, 2006 interview with Walker was protected by the ADEA, because McMahon alleged both disability and age discrimination by that point. In determining temporal proximity, the Court considers the critical date as the one on which the decision makers first knew of McMahon's protected activity. Pappas and Gutierrez first learned of it from McMahon's June 28, 2006 letter in response to the proposal to remove him. Although McMahon's June 28, 2006 letter did not explicitly state that he had filed a complaint charging age discrimination, in the letter McMahon advised that he had filed a complaint with the EEO in the sentence following the one in which he accused the SBA of age and illness discrimination.

The Court infers that Pappas and Gutierrez knew that McMahon was engaged in activity protected under the ADEA upon their receipt of the June 28, 2006 letter. It is not clear if Montes learned of it at that time, but whether he did or not, Montes was no longer involved in the process after he earlier had proposed McMahon's removal. Therefore, the critical period–between June 28, 2006 and July 11, 2006, the date of Pappas' decision to remove McMahon–is approximately two weeks. Ordinarily, this would lead to a fairly strong inference of retaliation.

However, the ultimate question is causation. This situation is the exact opposite of "cat's paw" cases in which a subordinate with an improper motive gets a superior to "rubber-stamp" a decision. *See English v. Colo. Dept. of Corr.*, 248 F.3d 1002, 1011 (10th Cir. 2001). Here, Montes–the subordinate–could not have had a retaliatory motive because he did not know of McMahon's protected activity at the time Montes proposed McMahon's removal. Instead, the Court must look at the motives of Pappas, the superior. In discussing the "cat's paw" theory, the Tenth Circuit has made it clear that the focus should not be on the relative amount of influence the individuals exerted on the decision. *E.E.O.C. v. BCI Coca-Cola Bottling Co. of Los Angeles*, 450 F.3d 476, 487-88 (10th Cir. 2006). Instead, the inquiry should be centered on causation, and ordinary principles of tort causation should guide that inquiry. *Id.* Thus, in the "cat's paw" situation, an independent investigation by the superior breaks the causal link with the action by the subordinate with the improper motive. *Id.* at 488.

The Court assumes the same reasoning applies to this "inverse cat's paw" situation. The question is not the relative influence of Montes, Gutierrez, and Pappas on the final decision. Instead, it is whether McMahon's protected activity was an actual and proximate cause of his removal. This could only have been the case if McMahon had successfully rebutted the charge

against him, breaking the causal chain started by Montes' proposal. Otherwise, the causal chain extends to Montes, who could not have had a retaliatory motive. The evidence shows that McMahon did not rebut the charge, and therefore McMahon's protected activity could not have been the cause of his removal.

The discussion turns again to pretext. For the same reasons it was not pretext for discrimination, Defendant's reason for removing McMahon was not pretext for retaliating against him. In addition, Defendant directs the Court's attention to another line of cases in which the employer initiated a disciplinary process before the employee engaged in protected activity but the process culminated in an adverse employment action afterwards. *E.g.*, *Morgan v. Hilti, Inc.*, 108 F.3d 1319, 1324-25 (10th Cir. 1997). In *Hilti*, the plaintiff was warned that her attendance problems "*could* result in disciplinary action, up to and including termination." *Id.* at 1322 (emphasis added). After she filed an employment discrimination charge (of which the employer was aware), the employer continued to warn her about her continuing absences, including a final warning that stated she "*would* be terminated" if there were more absences. *Id.* (emphasis added). After she took some additional unscheduled days off, the employer fired her. *Id.* The *Hilti* court stated, "The additional warnings, followed by discharge ..., *simply completed* the disciplinary process already set in motion." *Id.* at 1324 (emphasis added).

It should be noted that the situation in *Hilti* was somewhat different, because the process in *Hilti* started before the employee engaged in protected activity. Here, McMahon first engaged in protected activity on June 5, 2006, before the removal process formally started on June 14, 2006 with Montes' notice of proposed removal. Again, though, the Court considers the critical date to be June 28, 2006, when Pappas and Gutierrez learned of McMahon's protected activity. Therefore, *Hilti* does apply.

Defendant argues *Hilti* describes a situation where plaintiff has failed to show causation. The situation could be thought of in that way. *Cf. Clark County Sch. Dist. v. Breeden*, 532 U.S. 268, 272 (2001) ("Employers need not suspend previously planned transfers upon discovering that a Title VII suit has been filed, and their proceeding along lines previously contemplated, though not yet definitively determined, is no evidence whatever of causality."). However, the *Hilti* court did not describe the evidence in that case as a failure to show causal connection but as a failure to show pretext. *Hilti*, 108 F.3d at 1324. The two views are not incompatible, though: the Tenth Circuit has noted that there is an overlap between pretext and causation. *Wells v. Colo. Dept. of Transp.*, 325 F.3d 1205, 1218 (10th Cir. 2003).

Although *Hilti* was decided at the summary judgment stage, it is useful for evaluating the evidence of pretext. Defendant maintained the same reason for removing McMahon both prior to and after learning of his protected activity; this is strong evidence that the reason was not pretext for retaliation. If McMahon had rebutted the charge of physical inability, then the Court could not draw the same conclusion, just as the *Hilti* court could not if the plaintiff had consistently shown up for work after filing her complaint.

In summary, the evidence does suggest a prima facie case for retaliation because there was a close temporal proximity between McMahon's protected activity and his removal. However, when examined more closely, the evidence shows that McMahon's protected activity was not the cause of his removal. Furthermore, Defendant's reason for removing McMahon–physical inability to perform the duties of his position–was not pretext for retaliation. Finally, Gutierrez testified credibly, consistent with Pappas' testimony at a trial deposition, that the removal was not retaliation for McMahon's protected activity. The Court concludes that McMahon's removal was not motivated in whole or in part by his protected activity and

therefore the SBA is not liable on McMahon's claim of retaliatory discharge.


_____
SENIOR UNITED STATES DISTRICT JUDGE